# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs December 18, 2001

## STATE OF TENNESSEE v. DARRYL LEE ELKINS

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S41,530    R. Jerry Beck, Judge**

**No. E2001-01245-CCA-R3-CD**
**March 27, 2002**

Defendant, Darryl Lee Elkins, was convicted by a Sullivan County jury of child rape, a Class A felony, and attempted child rape, a Class B felony. Defendant received consecutive sentences of twenty-five years for the Class A felony, and twelve years for the Class B felony. On appeal, Defendant challenges the sufficiency of the evidence to sustain the convictions, arguing that his convictions should be reversed because the "jury improperly accredited the victim's testimony who committed perjury at trial." After a thorough review of the record, we affirm the judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed.**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., joined. JOSEPH M. TIPTON, J., concurring in part and dissenting in part.

Mark H. Toohey, Kingsport, Tennessee, for the appellant, Darryl Lee Elkins.

Paul G. Summers, Attorney General and Reporter; Angele M. Gregory, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; James F. Goodwin, Assistant District Attorney General; Gregory A. Newman, Assistant District Attorney General; and Mary Katharine Harvey, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Thirteen-year-old B.G., the victim in this case, testified that in April 1997, Defendant sexually accosted him while he was living with his maternal grandmother in Kingsport, Tennessee. (We will refer to the victim of child sexual abuse only by his initials.) B.G. testified that Defendant, his mother's boyfriend, often visited the home and stayed overnight. In April 1997, B.G. was eleven years old.

B.G. testified that one night in April 1997, Defendant entered his room as he was lying face-down on the bed. Defendant climbed on top of him and began to "bounce" up and down. Although

he told Defendant to stop, Defendant would not listen. B.G. testified that he yelled for help and Roy Carrico, his first cousin, entered the room and pulled Defendant off. According to B.G., Mr. Carrico warned Defendant not to touch B.G. again. Although B.G. was unable to see Defendant's face, he testified that he recognized Defendant's tattoos on his hand and arms. B.G. testified that he was wearing boxer shorts and that Defendant was wearing a shirt and jeans. Defendant did not attempt to remove B.G.'s clothing. B.G. also could not tell if Defendant's pants were removed. B.G. further testified that during the attack, his mother, Ms. Rhonda Dawn Williams, was "passed out" in the living room. B.G. recalled the events of this particular day because his mom had wrecked her van earlier in the day.

B.G. testified that approximately two weeks later, Defendant entered his room again. B.G. stated that shortly thereafter, his mother entered the room and sat down in a chair beside his bed. Defendant then removed his pants and B.G.'s pants and climbed on top of him. B.G. testified that he felt Defendant put his "weiner" in B.G.'s behind. The anal penetration lasted for about five minutes, and B.G. stated that afterwards, he felt a "gooey" substance. B.G. also testified that Defendant held a knife to his throat and threatened to kill him if he told anyone. Then, Defendant and Ms. Williams left the room together. B.G. testified that although his mother witnessed the attack, she did not say or do anything. After the rape, B.G. began to have problems "soiling his pants."

Shortly after the rape occurred, B.G. and his siblings were placed in foster care for reasons unrelated to the above-described actions by Defendant. In May 1997, B.G. reported the rape to his foster mother, Georgia Martin. Ms. Martin immediately contacted B.G.'s social worker and the police. During direct examination, B.G. testified that he first spoke with Ms. Louise Crum, a counselor, and identified Roy Carrico as his attacker because "my mom told me to tell her that." However, B.G. further testified that he later told Ms. Crum that Defendant raped him. On cross-examination, B.G. claimed that he identified Defendant as the perpetrator the first time. Furthermore, when interviewed by detectives during the rape investigation, B.G. offered conflicting statements regarding whether his mother was present during the attacks.

Dr. John Heise examined B.G. on June 4, 1997. B.G. was referred to his office by the Department of Human Services. Dr. Heise testified that B.G. stated that Defendant attempted to rape him on one occasion, and actually raped him on a subsequent occasion. During the medical examination, Dr. Heise discovered that B.G.'s rectal opening had lost most of its natural tone and was slightly enlarged. Dr. Heise diagnosed B.G.'s condition of "soiling his pants" as encopresis. He explained that encopresis causes a slow involuntary leakage of the feces from the rectum that is often caused by forceful penetration by a finger, penis, or other foreign object into the anal cavity. Dr. Heise further testified that B.G.'s condition was probably caused by a severe physical and psychic trauma.

During the State's case-in-chief, defense counsel recalled and again cross-examined B.G. B.G. testified that on April 12, 1997, his parents were involved in a serious altercation that involved a shotgun and that his mother received a broken arm. B.G. stated that he witnessed the fight and was

later called to testify in court. B.G. admitted that during this time period he was very unhappy and under a lot of stress. B.G. further testified that the altercation occurred before he was raped.

Roy Carrico, who was in custody on an unrelated charge, testified for the defense. He stated his belief that B.G. was his cousin and that he knew Defendant from the neighborhood for about four or five years. Mr. Carrico refuted B.G.'s testimony, further stating that he never pulled Defendant off B.G. and that B.G. never told him that Defendant assaulted him. Mr. Carrico admitted that he had been convicted of aggravated assault and theft.

B.G.'s mother, Rhonda Grills Williams, was charged with facilitation of child rape, and was tried at the same time as Defendant, Darryl Lee Elkins. She was convicted, but her case is not on appeal before this Court. She testified in her own defense and related that she was married when she began a relationship with Defendant. She acknowledged that in April 1997, Defendant occasionally spent the night with her at her mother's home. However, in April 1997, B.G. did not live there. She also testified that when B.G. visited the home, he always slept in a room with his grandmother and siblings. Ms. Williams testified that to her knowledge, neither event actually occurred. She stated: "I would have killed Darryl. I would not let [Defendant] stand by and hurt my child." She also denied coercing B.G. to lie. Ms. Williams admitted that in 1995, she and her ex-husband were convicted of fraud.

## ANALYSIS

When a defendant challenges the sufficiency of the evidence, the burden rests with the defendant to prove that the evidence was insufficient to support the verdict returned by the trier of fact. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). On appeal, we must review the evidence, in the light most favorable to the prosecution, to determine if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Keough, 18 S.W.3d 175, 180-81 (Tenn. 2000) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). A guilty verdict shall be set aside on appeal if the evidence was insufficient to support the findings of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). The standard for appellate review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of both. See State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

First, Defendant challenges his conviction for child rape. Defendant argues that there was insufficient evidence to support his conviction because the only proof that he raped the victim was presented by the testimony of the victim, B.G. Furthermore, Defendant contends that B.G.'s testimony was contradicted by his mother, whom he alleged was present during the rape.

Child rape is defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522 (1997). At trial, B.G. testified that Defendant sexually penetrated him while his mother watched. In rebuttal, Defendant offered the testimony of the mother, Ms. Williams, who denied

having any knowledge of the rape. Ms. Williams further stated, "I would not stand by and let someone do this to my son, I would kill anyone whoever tried to do this." Dr. Heise's testimony regarding B.G.'s physical condition corroborated that a rape had occurred.

The substance of Defendant's argument is that the verdict cannot be sustained because the State and the Defendant presented conflicting evidence. Here, the jury's guilty verdict, approved by the trial court, accredited the testimony of the witnesses for the State, including the victim, and resolved all conflicts in favor of the State's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and the factual issues raised by the proof are resolved by the jury, and this Court will not reevaluate or reweigh the evidence. See id. Accordingly, we find that the evidence, when viewed in the light most favorable to the state, was sufficient to sustain Defendant's conviction of child rape.

Next, Defendant argues that the evidence was insufficient to sustain his conviction of attempted child rape. While this is a much closer question, we conclude, based upon recent precedent of our supreme court, that the evidence was sufficient to support the conviction of attempted child rape.

Criminal attempt is statutorily defined as follows:

> **39-12-101. Criminal Attempt. --** (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.
> (b) Conduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense.

Tenn. Code Ann. § 39-12-101(a)-(b) (1997).

As stated earlier, child rape is defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age." Id. § 39-13-522 (1997). Tennessee Code Annotated section 39-13-501, defines sexual penetration as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight,

of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body."

The count of the presentment which charges attempted child rape states in full as follows:

The Grand Jurors for Sullivan County, Tennessee, duly empaneled and sworn upon their oath present and say that <u>DARRYL L. ELKINS</u> between on or about March and April, 1997, in the State and County aforesaid and before the finding of this presentment did unlawfully, intentionally, knowingly and feloniously attempt to have sexual penetration of [B.G.], date of birth: July 25, 1986, a child less than thirteen years of age, which conduct constituted a substantial step toward the commission of this offense, contrary to Tennessee Code Annotated, Sections 39-12-101 and 39-13-522, a Class B felony, and [a]gainst the peace and dignity of the State of Tennessee.

Defendant was charged with attempted rape, pursuant to subsection (a)(3) of Tennessee Code Annotated section 39-12-101, which provides: "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the *conduct constitutes a substantial step* toward the commission of the offense." (Emphasis added).

The first described encounter between Defendant and B.G., which comprises the proof of the attempted child rape, occurred in B.G.'s bedroom late at night. B.G. was lying on his bed, on his stomach, wearing only his boxer underwear. The lights were off. Defendant came into the room, laid down on top of B.G., and began to bounce on B.G. Specifically, the victim testified that "[Defendant], then he got on top of me and started to bounce me. . . . He was on top of me abouncing." The victim told Defendant to stop, but Defendant did not stop until the victim's cousin came into the room and forcefully removed Defendant. The victim testified that he did not immediately report the incident because he was too ashamed of what Defendant had done to him to do so. Defendant did not remove, or attempt to remove, the victim's boxer underwear, and there is no proof that the Defendant removed any portion of his own clothing during this incident. There is no direct evidence that the Defendant touched any "intimate" part of B.G.'s body, but the proof does show that B.G. remained lying down on his stomach during the incident. Defendant "got on top of" B.G. The prosecutor questioned B.G. as to what B.G. meant when he claimed Defendant "bounced" him. B.G. responded, "[h]e was on top of me abouncing." During the "bouncing" B.G. observed tattoos on the Defendant's hands and arm. The jury could infer from this testimony that Defendant was lying prone, face down, on top of the victim at the time of the "bouncing."

The proof showed that two weeks later, Defendant entered the bedroom of the victim a second time, during the night, with the lights off in the room. On this occasion, Defendant inserted his penis into the victim's anus while the victim was lying on his stomach in bed, as described above.

In State v. Fowler, 3 S.W.3d 910 (Tenn. 1999), our supreme court addressed the issue of whether delivery of a check by a defendant for sex with a person whom he understood to be a minor could constitute a substantial step toward the commission of statutory rape. The court held that the evidence was sufficient to support the jury's verdict of guilt. Id. The Fowler court stated:

> This Court recognized [in State v. Reeves, 916 S.W.2d 909 (Tenn. 1996)] that prior to the passage of the 1989 criminal reform act a finding of criminal attempt required evidence of: "(1) an intent to commit a specific crime; (2) an overt act toward the commission of that crime; and (3) a failure to consummate the crime." [citing Reeves, 916 S.W.2d at 911]. *The overt act element required a distinction between conduct that was merely preparatory and conduct that constituted a "direct movement toward the commission after the preparations had been made*."

Fowler, 3 S.W.3d at 911 (emphasis added) (citations omitted).

The court in Fowler further noted that in Reeves, the "mere preparation test" was abandoned. The defendants in Reeves had apparently been caught in the act of preparing to put rat poison in a teacher's coffee cup. The rat poison was found in the purse belonging to one of the defendants, which was lying next to the teacher's coffee cup on her desk. Emphasizing that the "mere preparation test" had been abandoned, the court in Fowler quoted as follows from Reeves:

> [*Requiring an overt act] severely undercuts the objective of prevention . . . .* Once a person secretly places a toxic substance into a container from which another person is likely to eat or drink, the damage is done. Here, if it had not been for the intervention of the teacher, she could have been rendered powerless to protect herself from harm."

Fowler, 3 S.W.3d at 912 (emphasis added; brackets in original).

Subsection (b) of the criminal attempt statute, Tennessee Code Annotated section 39-12-101, states that "[c]onduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense." Two weeks after the first incident, Defendant clearly committed child rape against the victim in the same room, under identical circumstances, except that on the second incident, the victim's mother was also in the room. Our research of this issue has not revealed any cases wherein the court held that proof of the commission of a crime cannot be used to prove the defendant's intent to *attempt* to commit the same crime on a prior occasion against the same victim, under almost identical circumstances, especially when the prior incident was as close in time as in this case.

In Fowler, the court affirmed a conviction for attempted statutory rape. The exchange of money is not an element of statutory rape. However, under the circumstances of that case (including statements made by the defendant and the proof of the location and circumstances leading up to delivery of the check), the supreme court held that payment by the defendant for "straight sex" with

a person he perceived to be a minor child, constituted a substantial step toward the commission of statutory rape. Id. at 910-12. The supreme court in Fowler found that

> Requiring conduct beyond the defendant's conduct in this case would be inconsistent with both the general goal of crime prevention and our analysis in Reeves. It would create a dangerous precedent by requiring that the defendant take delivery of the boy *or actually begin some act that would approach sexual penetration.*

Id. at 912 (emphasis added).

We hold that the evidence under the facts of this case, in light of the standard set forth in Fowler, is sufficient to support Defendant's conviction for attempted child rape. Defendant is not entitled to relief on this issue.

In a related issue, Defendant claims that the victim's testimony alone was insufficient to sustain his convictions because the victim perjured himself at trial.

On direct examination, the victim testified as follows:

Q. Okay. And at some point, were you able to visit with your mom at the, at some office there in Rogersville?

A. Yes.

Q. And did you, did you tell one of the counselors there that someone besides Darryl had actually attacked you and done this to you?

A. Yes.

Q: Okay. And who did, who did you talk to? Do you remember the person?

A: I talked to Louise Crum.

Court: What, what, what was the name, I'm sorry, Louise who?

A: Louise Crum.

Q: Last name Crum, Your Honor. And who did you tell Ms. Crum had done these things to you?

A: Roy Carrico.

Q: Why did you tell Ms. Crum that Roy Carrico had done these things to you?

A:      Because my mom told me to tell that Roy Carrico done it.

However, on cross examination, B.G. testified as follows:

Q:      Now, when you went to see Ms. Crum, you fully understood that Ms. Crum needed to know the truth about what was going on in order to help you, didn't you?

A:      Yes.

Q:      And the first time you met with Ms. Crum, you told her that Roy Carrico was the person who did these things to you, didn't you?

A:      No.

Q:      You didn't? Ms. Louise Crum? Well, let me ask you this way. Did you ever tell Ms. Louise Crum that Roy Carrico was the person who did these things to you?

A:      No.

Q:      Never?

A:      I told her that my mom told me to tell her that.

Tennessee Code Annotated section 39-16-702 (a), states that a person commits perjury when, with the intent to deceive, that person:

(1)  Makes a false statement, under oath;
(2)  Makes a statement, under oath, that confirms the truth of a false statement  previously made and the statement is required or authorized by law to be made under oath; or
(3)  Makes a false statement, not under oath, but on an official document required or authorized by law to be made under oath and stating on its face that a false statement is subject to the penalties of perjury.

Inconsistencies in testimony do not always equate with "perjury." Further, "although inconsistencies or inaccuracies may make the witness a less credible witness, the jury's verdict will not be disturbed unless the inaccuracies or inconsistencies are so improbable or unsatisfactory as to create a reasonable doubt of the appellant's guilt." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999). The inconsistencies in B.G.'s testimony do not create a reasonable doubt of Defendant's guilt of child rape and attempted child rape. Defendant is not entitled to relief on this issue.

**CONCLUSION**

For the foregoing reasons, we affirm the judgments of the trial court as to both of the conviction for child rape and the conviction for attempted child rape.

_____
THOMAS T. WOODALL, JUDGE